*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0344p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL HOCKEY LEAGUE PLAYERS
ASSOCIATION, et al.,
　　　　　　　　　*Plaintiffs-Appellants,*

　　　*v.*

PLYMOUTH WHALERS HOCKEY CLUB, et al.,
　　　　　　　　　*Defendants-Appellees.*

No. 04-1173

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-70968—Victoria A. Roberts, District Judge.

Argued: February 4, 2005

Decided and Filed: August 15, 2005

Before: SILER, COLE, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael P. Conway, GRIPPO & ELDEN LLC, Chicago, Illinois, for Appellants. Stephen F. Wasinger, WASINGER, KICKHAM & HANLEY, Royal Oak, Michigan, for Appellees. **ON BRIEF:** John E. Bucheit, John R. McCambridge, GRIPPO & ELDEN LLC, Chicago, Illinois, for Appellants. Stephen F. Wasinger, Gregory D. Hanley, WASINGER, KICKHAM & HANLEY, Royal Oak, Michigan, for Appellees.

---

## OPINION

---

　　　CLAY, Circuit Judge.　Plaintiffs, the National Hockey League Players Association ("NHLPA"), Anthony Aquino ("Aquino"), and Edward Caron ("Caron") appeal the dismissal, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, of their suit under the Sherman Antitrust Act, 15 U.S.C. § 1, against Defendants, the Ontario Hockey League ("OHL"), its member Clubs, and its Commissioner, David Branch ("Branch").

　　　This case is before this Court for the second time.　In 2003, we reversed the district court's grant of a preliminary injunction to Plaintiffs, on the ground that Plaintiffs had failed to identify a relevant market as required under the Sherman Act. *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club* ("*NHLPA I*"), 325 F.3d 712, 714-17 (6th Cir. 2003).　Plaintiffs filed a second amended complaint in an attempt to cure the defects identified by this Court in *NHLPA I*.　The

1

district court found these efforts unpersuasive, and dismissed Plaintiffs' suit for failure to state a claim upon which relief could be granted. For the reasons that follow, we **AFFIRM** the order of the district court.

## BACKGROUND

### I.      Substantive Facts

Many of the facts set forth below were included in this Court's factual discussion in *NHLPA I*. We reiterate them here because of their importance to our determination of the claims at issue in this appeal.

The Ontario Hockey League ("OHL") consists of twenty teams, with players aged sixteen to twenty. Two of the teams are located in Michigan, one is in Pennsylvania, and the remaining teams are based in Ontario, Canada. The OHL, along with the Western Hockey League and the Quebec Major Junior Hockey League, form the "Major Junior Leagues" of the Canadian Hockey League ("CHL"). The Major Junior Leagues constitute one of the three major sources of players in the National Hockey League's ("NHL") entry draft; the others are European leagues and American colleges and high schools.

OHL eligibility rules permit each team to carry only three twenty-year-old, or "overage," players. Additionally, under the OHL's Rule 7.4, which is at the heart of this case, no overage player can be signed by an OHL team unless he was previously on a Canadian Hockey Association ("CHA") or USA Hockey Player's Registration the previous season. The National College Athletic Association ("NCAA") does not permit players holding either type of registration to play at a NCAA school. These two rules – the OHL rule requiring overage players to have a been on a CHA or USA Hockey Registration, and the NCAA rule barring players with either of those registrations – combine to prevent OHL teams from signing any twenty-year-old NCAA players, because such a player would not have been permitted by the NCAA to have obtained the registration required by the OHL of twenty-year-old players.

Rule 7.4 is commonly referred to as the "Van Ryn Rule." Mike Van Ryn ("Van Ryn") was a University of Michigan hockey player when he was drafted by the New Jersey Devils, an NHL team, in June 1998. Pursuant to the Collective Bargaining Agreement ("CBA") between the NHL and the NHLPA, the Devils thus obtained the rights to Van Ryn for one year, at which point, if the Devils failed to sign Van Ryn, he would become an unrestricted free agent. Under the terms of the CBA,[1] those rights would only be extended past one year if Van Ryn remained in NCAA competition, or went to play for a non-affiliated hockey league.

Van Ryn remained in NCAA competition at the University of Michigan for one year following the draft, which extended the Devils' rights to him for one year. He then signed with the Sarnia Sting, an OHL club. The OHL is affiliated with the NHL, and therefore, the Devils' rights to Van Ryn were not extended by Van Ryn's signing with the Sting. Van Ryn thus became an unrestricted free agent in June 2000, and signed a three-year contract with the NHL's St. Louis Blues. Had Van Ryn not played in an affiliated league for the year during which the Devils had exclusive rights to him, his only path to free agency would have been to sit out for the season.

---

[1] As hockey fans are painfully aware, the CBA expired in September 2004 and a new CBA was not agreed upon until July 2005, resulting in the loss of the 2004-2005 NHL season. In February of this year, Defendants submitted a tardy and extremely cursory "suggestion of mootness," based on the expiration of the CBA. As Defendants failed to articulate any reasonable basis upon which this Court could conclude that the expiration of the CBA renders this appeal moot, we reject the "suggestion of mootness."

The Devils, with the support of the NHL, attempted to declare Van Ryn a "defected player" ineligible for free agency, but an arbitrator rejected this effort. Within two months of the arbitration decision and Van Ryn's signing with the Blues, the OHL adopted the "Van Ryn Rule." Unsurprisingly, Plaintiffs regard the adoption of the rule as an attempt to prevent other NCAA players from achieving free agency via the route traveled by Van Ryn. Defendants dispute this motive, and note that a rule similar to the Van Ryn Rule, which prevented overage players from playing in the OHL if they had not played there as nineteen-year-olds, was in effect from 1992 to 1998. David Branch, the OHL Commissioner, has stated that the rule was implemented because, given that "the opportunities for overage players are obviously limited by OHL rules, it seemed fitting and appropriate to include those players who had given the OHL their time and talent over a number of years and to exclude those who had not done so."

Defendants also point out that former NCAA players who will not turn twenty before December 31 of any season may play in the OHL. However, pursuant to Section 8.4 of the CBA, players generally must be at least nineteen years old to be selected in the NHL Entry Draft. Thus, few NCAA players who have been drafted by an NHL team will be able to sign with an OHL team and follow the path taken by Mike Van Ryn to unrestricted free agency.

Plaintiffs Anthony Aquino ("Aquino") and Edward Caron ("Caron"), were, at the time the complaint was filed, twenty-year-old NCAA hockey players who aspired to play in the NHL. Both players contend that the Van Ryn Rule precluded them from achieving unrestricted free agency and the financial rewards it can confer. Aquino was drafted by the Owen Sound Attack, an OHL team, at age sixteen. He chose to play instead at Merrimack College in Massachusetts, and remained at Merrimack for three seasons. The Sound Attack later traded its rights to Aquino to another OHL team, the Oshawa Generals. In June 2001, Aquino was drafted by the Dallas Stars of the NHL. Aquino desired to play in the OHL during the 2002-2003 season, and did in fact play for the Generals briefly after the district court issued a preliminary injunction barring enforcement of the Van Ryn Rule and until that injunction was stayed by this Court in *NHLPA I*. Aquino ultimately signed an NHL contract with the Atlanta Thrashers. Caron similarly argues that he sought to play in the OHL in 2002-2003, and that he would have signed an OHL contract but for the Van Ryn Rule.

## II.    Procedural History

Plaintiff NHLPA, an unincorporated labor association and the exclusive collective bargaining representative for all current and future NHL hockey players, filed a complaint in the United States District Court for the Eastern District of Michigan on March 12, 2001, seeking declaratory and injunctive relief on behalf of present and future NHL players. Defendants moved to dismiss the suit on the grounds of *forum non conveniens* and lack of personal jurisdiction. The district court denied appellants' motion to dismiss. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club et al.*, 166 F. Supp. 2d 1155 (E.D. Mich. 2001).

On July 18, 2002, the NHLPA moved to amend the complaint to add Aquino as a plaintiff and requested a preliminary injunction, barring enforcement of the Van Ryn Rule, on his behalf. Both motions were granted on August 30, 2002. Defendants appealed the grant of the preliminary injunction to this Court, which stayed the injunction on November 4, 2002, and then reversed and remanded the case to the district court.

On remand, Plaintiffs filed a second amended complaint, which added Caron as a plaintiff and incorporated additional allegations in an attempt to address this Court's opinion in *NHLPA I*. Defendants, arguing that Plaintiffs had not succeeded in curing the defects identified by this Court's decision, moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The

district court granted that motion and entered judgment in favor of Defendants on December 30, 2003. Notice of this appeal was filed on January 20, 2004.

## DISCUSSION

### I.    Standard of Review

This Court conducts *de novo* review of a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680 (6th Cir. 2004) (citing *Valassis Communications v. Aetna Cas. & Sur. Co.*, 97 F.3d 870, 873 (6th Cir. 1996)).

In considering whether a complaint fails to state a claim upon which relief can be granted, this Court construes "'the complaint in the light most favorable to the plaintiff, accept[s] all factual allegations [of the plaintiff] as true, and determine[s] whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief.'" *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir. 2004) (quoting *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 451 (6th Cir. 2003)) (citations omitted). Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions. Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993).

### II.   The Sherman Act

Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. As is obvious from the language and purpose of the Sherman Act, the unilateral actions of a solitary actor cannot violate Section 1, and therefore a threshold issue in all Sherman Act cases is whether more than one actor is implicated in the challenged restraint. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-70 & n.15 (1984).

Because every contract could be construed as a restraint of trade, the Supreme Court has held that for a claim to be actionable under the Sherman Act, the restraint challenged must be "unreasonable." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). Whether a restraint is unreasonable is determined under either a *per se* rule or the "rule of reason." *NHLPA I*, 325 F.3d at 718 (citations omitted).

The *per se* rule is appropriate where the challenged practice is "entirely void of redeeming competitive rationales." *Id.* (quoting *Law v. Nat'l Collegiate Athletic Ass'n*, 135 F.3d 1010, 1016 (10th Cir. 1998)). In granting Plaintiffs' motion for a preliminary injunction, the district court applied the *per se* rule. This Court reversed the district court and held that the rule of reason approach was appropriate, noting that "'courts consistently have analyzed challenged conduct under the rule of reason when dealing with an industry in which some horizontal restraints are necessary for the availability of a product' such as sports leagues." *Id.* at 719 (quoting *Law*, 134 F.3d at 1019). We apply the rule of reason here as well.

Under the rule of reason, a plaintiff has the burden of demonstrating significant anti-competitive effects within a relevant market. If the plaintiff meets this burden, the defendant is required to proffer evidence of pro-competitive effects of the restraint justifying the anti-competitive injuries. Assuming the defendant succeeds in doing so, the burden shifts back to the plaintiff to "show that any legitimate objectives can be achieved in a substantially less restrictive manner." *Id.*

at 718 (citations omitted); *see also Worldwide Basketball and Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 959 (6th Cir. 2004).

### III.    Plaintiffs' Claim of a Conspiracy Among Defendants

With these principles in mind, we turn to Count I of Plaintiffs' second amended complaint, which alleges a conspiracy among the member teams of the OHL to adopt the Van Ryn Rule in violation of the Sherman Act.

#### A.    Multiple actor requirement

A threshold requirement of the Sherman Act is that the challenged agreement be entered into by multiple parties.  15 U.S.C. § 1; *see Copperweld Corp.*, 467 U.S. at 769-70 & n.15.  While Defendants do not contend that the OHL acted as a single actor in this case, we nonetheless will briefly explain our conclusion that the OHL and the various member teams of the OHL represent multiple actors.

Other courts considering the actions of professional sports leagues have found the leagues to be joint ventures whose members act in concert (i.e., *agree*) to promulgate league rules, rather than one solitary acting unit.  *N. Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1257 (2d Cir. 1982); *see also Fraser v. Major League Soccer*, 284 F.3d 47 (1st Cir. 2002); *Bd. of Regents*, 468 U.S. at 100-101.  The Second Circuit explained that to hold otherwise would create a "loophole [that] would permit league members to escape antitrust responsibility for any restraint entered into by them that would benefit their league . . . even though the benefit would be outweighed by its anticompetitive effects." *N. Am. Soccer League*, 670 F.2d at 1257.  We are persuaded that this logic applies in the instant case.  Just as the National Football League could not accurately be characterized as a "single economic entity," *id.*, neither could the OHL, which exists only as constituted by its twenty member teams.  We therefore conclude that when they adopt eligibility rules, the member teams of the OHL constitute multiple actors who act in concert.  Thus, the adoption of the Van Ryn Rule represents an agreement between multiple actors, as required by Section 1 of the Sherman Act.

#### B.    Whether the district court erred in determining that Plaintiffs failed to identify a relevant market, as required to state a "rule of reason" anti-trust claim

##### 1.    *NHLPA I*

As we noted in *NHLPA I*, Plaintiffs' first complaint did not attempt to define a relevant market. *NHLPA I*, 325 F.3d at 720.  Nevertheless, in granting the preliminary injunction, the district court determined that the relevant market was "the market for competition among OHL and CHL teams for player services."  We rejected that holding, explaining that:

> [t]he market for player services in the OHL . . . is not a market that involves economic competition. The OHL rules clearly limit the amount a player may be paid to schooling and a limited stipend.[2] . . . [T]he effect on the market as defined by [Plaintiffs] is on athletic competition, which is not protected by the antitrust laws. The application of the Van Ryn Rule does not result in any economic injury to the 'market for competition among OHL and CHL teams for player services,' but merely substitutes one arguably less skilled player for another arguably more skilled player.

---

[2]Overage players receive a stipend of $150 per week; players under twenty receive fifty dollars per week. (footnote added).

> While a player barred by the Rule is precluded from taking advantage of the benefits of playing on an OHL team, numerous other categories of players, including anyone under sixteen or over twenty, are similarly barred.

*Id.* (citations omitted).

Plaintiffs argued before the district court on remand, and now before this Court, that the determination by the Sixth Circuit in *NHLPA I* that the OHL market for player services is not an economic market is not binding under the law of the case doctrine because it was made on appeal from a preliminary injunction. We disagree. The district court is bound by the determinations of this Court unless one of three circumstances is met: 1) substantially different evidence is subsequently raised; 2) a subsequent contrary and controlling view of the law is decided; 3) or a decision is clearly erroneous and would work a manifest injustice. *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997). On remand from *NHLPA I*, Plaintiffs filed a second amended complaint which added some general allegations regarding the OHL and/or CHL as a market for player services, including the assertion that "the OHL and CHL Clubs provide unique developmental opportunities for players like Aquino and Caron. Other professional leagues in North America and Europe are inferior developmental opportunities and/or are unwilling to sign players like Aquino and Caron." However, these broad allegations only confirm this Court's earlier holding that with respect to the market for player services in the OHL and/or CHL, the harm alleged is to athletic and not economic competition. Furthermore, these allegations do not constitute "substantially different evidence."

Neither this Circuit nor the Supreme Court, subsequent to the opinion in *NHLPA I*, has issued an opinion contrary to that case. Finally, we are satisfied that our prior decision in *NHLPA I* was not only not "clearly erroneous," but in fact was correct. Thus, none of the conditions announced in *Hanover Insurance* are met in this case, and both the district court and this Court are bound by our holding in *NHLPA I* that the OHL market for player services is not a market that involves economic competition. *NHLPA I*, 325 F.3d at 720.

However, this Court expressly refused to apply a rule of reason analysis to other markets for player services, as they had not been alleged in the complaint. *Id.* Nonetheless, in dismissing the case on remand, the district court concluded that "Plaintiffs have not made any persuasive arguments or cited any authority that would lead the Court to a different conclusion than the Sixth Circuit's that 'the market for player services,' whether it is in the OHL, CHL, *or NHL*, is not a market that involves economic competition within the meaning of the Sherman Act." J.A. at 64. (emphasis added). This is an erroneous and overbroad reading of *NHLPA I*. In *NHLPA I*, this Court's determination that the OHL market for player services is not an economic market was grounded in the fact that OHL players are paid fixed stipends and thus OHL teams do not compete with each other economically for players. Again, this Court expressly refused to consider whether other markets for player services might constitute relevant markets. *NHLPA I*, 325 F.3d at 720. The holding in *NHLPA I* therefore does not bar a finding that another market for player services is a relevant market if Plaintiffs can establish that it does involve economic competition, and the district court's apparent conclusion to the contrary was in error.

### 2.     The market for sixteen- to twenty-year-old hockey players in North America is a relevant market

We consider whether any of the remaining four proposed relevant markets alleged by Plaintiffs in their second amended complaint constitute relevant markets under Section 1 of the Sherman Act. They are the market for player services among teams in the Canadian Hockey League; the market comprised of North American organizations that compete for the services of twenty-year-old hockey players; the market comprised of North American organizations that compete for the services of hockey players ages sixteen through twenty; and the market for player services in the National Hockey League.

Generally, a relevant market is one which includes "products or services that are reasonably interchangeable with, as well as identical to, defendant's product" affected by the rule or regulation being challenged. *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 622 (6th Cir. 1999); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 404 (1956). A similar rule applies to supplier markets such as the employment market in the instant case: the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant. *See, e.g., NHLPA I*, 325 F.3d at 719; *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001); *see also Alabama Power Co. v. Fed. Power Comm'n*, 511 F.2d 383, 389 n.10 (D.C. Cir. 1974). Reasonable interchangeability "may be gauged by (1) the product uses, *i.e.*, whether the substitute [employees] can perform the same function, and/or (2) [employer] response (cross-elasticity); that is [employer] sensitivity to price levels at which they elect substitutes for the [employees'] service[s]." *White & White, Inc. v. Am. Hosp. Supply Co.*, 723 F.2d 495, 500 (6th Cir. 1983).

We conclude that the relevant market in this case is the pool of players from which the OHL draws its players, i.e., the market for sixteen- to twenty-year-old hockey players in North America. This market includes the NHL, the OHL, and other North American leagues. This market meets the requirement of reasonable interchangeability of employees with Defendants' employees, as there is significant substitution between the market for player services in the NHL and that for sixteen- to twenty-year-old players in other North American leagues, including the OHL. Indeed, as the NHLPA alleges in its complaint, "[t]he NHL and OHL share players and have detailed rules providing for the loan and recall of players between the OHL and NHL." J.A. at 42.[3]

Furthermore, unlike the market for player services in the OHL, this market is economically competitive. This is so because while the member teams of the OHL may not compete economically with each other for players within their league, they do have an economic impact on the market for sixteen- to twenty-year-old hockey players in North America, as do the other relevant leagues.

---

[3]A plaintiff bears the burden of proving facts, such as the existence of substitutability between products or cross-elasticity of demand, within each alleged market, such that a court could conclude, without more, that the market alleged was relevant. *See, e.g., Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001). Plaintiffs have not provided much market data or other significant facts to support their allegations as to substitutability for (or cross-elasticity of demand for) employees in the markets they allege. However, Defendants appear to accept that the North American employment market for hockey players aged sixteen to twenty is the relevant market. *See* Def. Brief at 11-12. We would also emphasize that this case is before us on appeal from a 12(b)(6) motion. *See Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market") (citing *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531(6th Cir. 2001)). Given this concession by Defendants, the fact that Plaintiffs have alleged some facts related to the relevant market inquiry, and the early stage of this litigation, Plaintiffs' failure to further develop these facts does not pose a barrier to relief.

Because of the cross-elasticity of demand between the NHL, OHL, and other leagues in North America for the services of sixteen- to twenty-year old hockey players, the remaining markets alleged by Plaintiffs (the market for player services among teams in the Canadian Hockey League; the market comprised of North American organizations that compete for the services of twenty-year old hockey players; and the market for player services in the National Hockey League) are overly narrow. The Eighth Circuit confronted a similar issue, albeit in a products market rather than a services market, in *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000). In that case, a manufacturer of auto transmissions sued an automobile race sanctioning body overs its restrictions on the types of transmissions which could be used in sanctioned races. Plaintiffs attempted to define the products market narrowly, as transmissions used in modified car racing sanctioned by Defendants. The court rejected that assertion because it required proof, which Plaintiffs failed to provide, that "there is no cross-elasticity of demand between this [sanctioned] game and other games that modified car racers might choose to play." *Id.* (citations omitted). The court instead defined the relevant market as transmissions used in all oval track racing.

We similarly conclude that the alternative markets proposed by Plaintiffs must fail because in each instance, Plaintiffs have failed to show that "there is no cross-elasticity of demand" between the market as narrowly defined (i.e., limited to the market for player services in the CHL, or the NHL, or limited to twenty-year-old players) and the broader market definition we accept today. *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-41 (3d Cir. 1997) (finding the market for a particular brand of pizza ingredient to be too narrowly defined to constitute the relevant market); *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (finding the market for TNT channel to be too narrow to constitute a relevant market; "a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product").

### C.    Whether the district court erred in determining that plaintiffs failed to identify anti-competitive effects of the Van Ryn Rule

Although we conclude that the district court erred in determining that Plaintiffs had failed to identify a relevant market, we decline to reverse the district court's dismissal of Count I of the complaint because Plaintiffs have failed to sufficiently identify anti-competitive effects of the Van Ryn Rule. As noted above, a plaintiff alleging an unreasonable restraint on trade under the rule of reason theory must show significant anti-competitive effects of the challenged restraint. *NHLPA I*, 325 F.3d at 718; *see also Worldwide Basketball*, 388 F.3d at 959.

Plaintiffs essentially allege two types of anti-competitive effects of the Van Ryn Rule: an effect on competition among OHL teams, and an effect on player salaries in the relevant market because some players who might otherwise have achieved free agency in the NHL are unable to do as a result of the Van Ryn Rule. For the reasons that follow, both of these arguments fail.

#### 1.    Harm to athletic competition is not a cognizable anti-competitive effect under the Sherman Act

Plaintiffs allege in their second amended complaint that "the Van Ryn Rule has an actual and significant impact on quality. By the OHL's own admission,[4] the Van Ryn Rule substitutes less skilled hockey players for more skilled hockey players, which has an actual and detrimental impact

---

[4] Although the district court challenged Plaintiffs' assertion that the Van Ryn Rule results in a diminished level of play in the OHL, Defendants appear to concede this point, but note: "[t]he whole league might be a more skilled league if it had no age restrictions at all. Who can quarrel that the best 20 year olds are, on the whole, more skilled than the best 16 year olds." Def. Brief at 17. (footnote added).

on the quality of the players in the OHL labor pool and the quality of the hockey games produced as a result." J.A. at 46.

This is exactly the argument that was rejected by this Court in *NHLPA I*, which noted that athletic competition "is not protected by the antitrust laws." 325 F.3d at 720. Plaintiffs do not allege that diminished quality of athletic competition results in an economic injury. The district court correctly rejected Plaintiffs' claim that the diminished level of play in the OHL as a result of the Van Ryn Rule is an anti-competitive effect within the meaning of the antitrust laws.

> **2.        Any harm caused by some players' inability to achieve free agency in the NHL is caused by the NHL's Collective Bargaining Agreement, and not the Van Ryn Rule**

The other anti-competitive effect alleged by Plaintiffs is that players who would have become NHL free agents by spending one year in the OHL must now enter the NHL through its draft system. The district court found that this effect had no detrimental economic effect on the markets identified by Plaintiffs, concluding that Plaintiffs "continue to confuse injury to *competitors*, which is not protected by antitrust laws, with injury to *competition*." J.A. at 67.

In our view, the district court's analysis mischaracterizes Plaintiffs' argument. Plaintiffs contend that the Van Ryn Rule eliminates one path to NHL free agency, thereby limiting the competition between NHL clubs for these players' services and rendering the market for NHL players, and, presumably, the market for all other young professional hockey players in North America, less competitive. Such an injury is an injury to competition within the meaning of the Sherman Act. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for 'the protection of *competition,* not *competitors.*'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) (emphasis in original).

However, we must still consider whether the Van Ryn Rule can fairly be said to be the cause of this injury. Defendants argue that the alleged effects of the Van Ryn Rule are actually caused not by the Rule but by the NHL's collective bargaining agreement ("CBA"), which sets forth the rules governing eligibility for free agency. Any anti-competitive effect of a properly bargained collective bargaining agreement is excluded from antitrust scrutiny by a non-statutory antitrust exemption. *See, e.g., Clarett v. Nat'l Football League*, 369 F.3d 124 (2d Cir. 2004). Therefore, if Defendants are correct that the injury complained of by the NHLPA is actually caused by the CBA, and not the Van Ryn Rule, then Plaintiffs have not stated a cause of action under the Sherman Act. (And certainly have not stated one against Defendants, who bear no responsibility for the CBA). We agree with Defendants that any anti-competitive effect caused by a restriction on the means by which players may achieve free agency in the NHL must be ascribed to the CBA and not the Van Ryn Rule, and that Plaintiffs have consequently failed to state a claim upon which relief can be granted.

This Court has not articulated a standard for determining when an injury to competition can be said to have been caused by an alleged restraint on trade. Indeed, we have been unable to uncover any cases addressing the issue of whether a defendant is subject to antitrust liability for secondary anti-competitive effects of the defendant's actions. We consider the alleged anti-competitive effects of the Van Ryn Rule to be secondary, at best, because although the Van Ryn Rule has had the effect of closing one formerly open route to NHL free agency, it is the CBA which prescribes the ways in which a player may achieve free agency in the NHL.

We decline, in this case, to establish definitive rules regarding whether or when an anti-competitive injury that is only secondarily or indirectly caused by a defendant's alleged restraint on trade may ever support a viable claim under the Sherman Act. We decline to do so because any

definition we adopt would not permit us to conclude that the Van Ryn Rule causes the anti-competitive effect alleged by Plaintiffs. Plaintiffs' quarrel is about who gets to be a free agent in the NHL, and it is the CBA that permits free agency for players drafted by the NHL who subsequently spend a year in the OHL and prohibits it, for example, for players who stay in the NCAA or go to a European league for the year following their selection in the NHL draft.

The reason Anthony Aquino and Edward Caron (assuming they possessed the requisite talent) were unable to achieve free agency in the NHL is not that the Van Ryn Rule prohibited them from playing in the OHL; it is that the CBA governing eligibility for NHL free agency says that they are not eligible for free agency. We would draw this conclusion under even the most lenient proximate cause standard. Ultimately, we draw this conclusion because common sense requires it. Only indefensibly circuitous logic would blame the rules governing who can play in the OHL, and not the rules governing who can become an NHL free agent, for preventing players from achieving free agency in the NHL.

## IV.     Plaintiffs' Claim of a Conspiracy Between the OHL and the NHL

Count II of Plaintiffs' second amended complaint alleges that Defendants conspired with the NHL to implement the Van Ryn Rule, with resultant anti-competitive effects, in violation of the Sherman Act. Although we conclude that Plaintiffs sufficiently alleged the existence of an agreement between the NHL and the OHL, this claim ultimately fails for the same reason that Plaintiffs' claim under Count I fails: Plaintiffs cannot show that the Van Ryn Rule is the cause of the alleged anti-competitive effects.

To succeed on their conspiracy claim, Plaintiffs must allege sufficient facts to support the existence of an agreement between the NHL and the OHL. This Court has held that circumstantial evidence can support a conspiracy claim, so long as the evidence is not "equally consistent with independent conduct." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999). Factors to consider in weighing circumstantial evidence of a conspiracy claim are: "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; (4) and whether the defendants have a common motive to conspire." *Id.* (citing *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1168 (6th Cir. 1995)). A showing that the defendants' actions, taken independently, would be contrary to their economic self-interest will ordinarily "tend to exclude the likelihood of independent conduct." *Id.*

In light of the liberal pleading rules, which require a court considering a 12(b)(6) motion to accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff, *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir. 2004) (citations omitted), we conclude that the district court erred in determining that Plaintiffs had failed to allege facts sufficient to support the existence of an agreement between the OHL and the NHL. This conclusion is based on our analysis of the allegations in the complaint relating to each of the factors to be considered in weighing circumstantial evidence of a conspiracy.

First, on the question of whether the defendants' action would be contrary to their economic self-interest if taken separately, Plaintiffs allege that the OHL has admitted that the Van Ryn Rule negatively impacts player quality, because it prevents OHL Clubs from signing talented twenty-year-old NCAA players. While diminished athletic competition in the OHL would not have an adverse impact on the market for player services in the OHL (because player salaries are fixed), Plaintiffs reasonably assert that it does adversely affect the economic success of the OHL and its marketing of its product. Defendants argue that the OHL's eligibility rules allow the OHL to "offer a different

type of competition for an audience that enjoys watching developing young players," thereby helping "create the product which the OHL markets." Def. Brief at 22. This may well be true, but at this stage of the litigation, the Court is required to make all reasonable inferences in favor of Plaintiffs. We find it not only reasonable but self-evident that better players provide a better product.

Second, Defendants' behavior in implementing the Van Ryn Rule could be interpreted as inconsistent with evidence presented by Plaintiff that Defendants earlier embraced the presence of overage NCAA players. Plaintiffs allege that after Van Ryn joined the OHL, the League Commissioner announced that the presence of a player of his caliber in the OHL would be of great benefit to his team and the league as a whole. It is at least odd that a rule designed to prevent such players from joining the league subsequently would be adopted.

Third, Plaintiffs have offered detailed allegations regarding the relationship between the OHL and the NHL which, if believed, would support a finding that officials of the two leagues "had the opportunity to exchange information relative to the alleged conspiracy." *Re/Max*, 173 F.3d at 1009.

Finally, Plaintiffs have alleged that the NHL had a strong interest in blocking the OHL as a path to free agency for its future players, and that the NHL exerts considerable financial influence over the OHL, resulting in a "common motive to conspire." *Id.* at 1009. These factual allegations, if believed, could support a finding that the NHL and OHL conspired to implement the Van Ryn Rule.

Of course, our inquiry does not end there. Plaintiffs still must show that the object of the conspiracy was a violation of the antitrust laws. In this regard, they make precisely the same argument that failed with respect to their claim under Count I: that the Van Ryn Rule causes players not to be able to achieve free agency in the NHL, with resultant anti-competitive effects. For the reasons discussed in the previous section of this opinion, Plaintiffs' argument must again fail. The Van Ryn Rule, whether adopted by conspiracy between the member clubs of the OHL or by conspiracy between the OHL and the NHL, does not cause the anti-competitive effects alleged by Plaintiffs. We therefore affirm the district court's dismissal of Count II of the complaint.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of this case.